No. 25-20457

---

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**SARAH BORCHGREVINK, solely in her capacity as Independent Administrator of the Estate of Matthew Ryan Shelton, Deceased; MARIANNA RUTH THOMSON, Statutory Wrongful Death Beneficiary of Matthew Ryan Shelton, Deceased**

*Plaintiffs – Appellees*

v.

**SHERIFF ED GONZALEZ,**

*Defendant – Appellant*

---

### On Appeal from the United States District Court
### Southern District of Texas, Houston Division
Civil Action No. 4:23-cv-3198
Honorable George C. Hanks, Jr., District Judge, presiding

---

### BRIEF OF APPELLEES

---

Respectfully submitted,

By /s/ Jeff Edwards
  JEFF EDWARDS
  State Bar No. 24014406
  JOHN FLOOD
  State Bar No. 07155910
  LISA SNEAD
  State Bar. No. 24062204

JOHN T. FLOOD, L.L.P.
819 N. Upper Broadway
Corpus Christi, Texas 78401
Tel. 361-654-8877
jeff@floodtriallawyers.com
john@floodtriallawyers.com
lisa@floodtriallawyers.com

**ATTORNEYS FOR PLAINTIFFS-APPELLEES**

No. 25-20457

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

SARAH BORCHGREVINK, solely in her capacity as Independent Administrator of the Estate of Matthew Ryan Shelton, Deceased; MARIANNA RUTH THOMSON, Statutory Wrongful Death Beneficiary of Matthew Ryan Shelton, Deceased

*Plaintiffs – Appellees*

**v.**

SHERIFF ED GONZALEZ,

*Defendant – Appellant*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

/s/ Jeff Edwards
JEFF EDWARDS
**Attorney for Plaintiffs-Appellees**

<u>Plaintiffs/Appellees:</u>
1.   Sarah Borchgrevink as Independent Administrator of the Estate of Matthew Ryan Shelton
2.   Marianna Ruth Thomson

<u>Plaintiffs' Counsel:</u>
3.   Jeff Edwards
4.   John Flood
5.   Lisa Snead

<u>Defendant/Appellant:</u>
6.   Sheriff Ed Gonzalez

<u>Additional Defendants Below:</u>
7.   Harris County, Texas
8.   Charley Lauder
9.   Elizabeth Garcia
10.  Paulino Olguin
11.  William Russell
12.  Garrett Woods
13.  Timothy Owens
14.  Kalin Stanford
15.  Brayan Silva
16.  Amber Bailey
17.  Amalia Ruiz
18.  Jeremiah Adebola
19.  Allyson Hurd
20.  Dentrell Woods
21.  Kimberly Rossell
22.  Marvin Perkins
23.  Lonnie Brooks
24.  Alejandro Nieto
25.  Bryan Collins

<u>Former Defendant Below</u>
26.  Harris County Hospital District d/b/a Harris Health

<u>Defendant/Appellant's Counsel:</u>
27.  Gregory Burnett

Defendant/Appellant's Additional Counsel below:

    28.    Rachel Fraser

Counsel for Additional Individual Defendants Below:

    29.    Joshua Green
    30.    Veronica Jones
    31.    Suzanne Bradley (former)
    32.    James C. Butt
    33.    Charles Shaw
    34.    Ricardo J. Navarro
    35.    Kelly R. Albin

Counsel for Former Defendant Below

    36.    John Strawn
    37.    Victoria Skinner

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees respectfully submit that oral argument is not necessary as Defendant-Appellee does not engage with the facts of the case or the District Court's opinion, thus the case should be decided on submission unless the Court would find oral argument helpful.

TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS** ................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ........................................... v

TABLE OF CONTENTS ................................................................ vi

TABLE OF AUTHORITIES .............................................................. viii

I.   JURISDICTIONAL STATEMENT ....................................................... 1

II.  STATEMENT OF ISSUES FOR REVIEW .............................................. 1

III. SUMMARY OF THE CASE ............................................................ 2

  A.  Factual Background ............................................................ 2

    1.  Sheriff Gonzalez knew the conditions, policies, practices, customs, and training programs in his jail denied insulin and blood glucose monitoring to Type 1 diabetics and did nothing to change them before they were inflicted on Matthew Shelton. ............................................... 4

    2.  Sheriff Gonzalez knew his policies, practices, and customs of understaffing and jailers' non-monitoring detainees placed detainees at substantial risk of harm, yet did nothing to correct them before Matthew Shelton was subjected to them. ........................................... 11

  B.  Procedural Background ....................................................... 17

IV. SUMMARY OF THE ARGUMENT ..................................................... 19

V.  ARGUMENT ........................................................................ 21

  A.  Standard of Review .......................................................... 21

  B.  Sheriff Gonzalez's brief fails to invoke the Court's interlocutory jurisdiction as it rejects Plaintiffs' alleged facts. ..................... 21

  C.  Sheriff Gonzalez implemented unconstitutional conditions of confinement at the Harris County Jail for which he is not entitled to qualified immunity. ......................................................... 23

1.   Sheriff Gonzalez's practices of understaffing, officer non-monitoring, and denying insulin and blood glucose monitoring at his jail created dangerous conditions of confinement of which he was aware. .................27

2.   The unconstitutional conditions of confinement in Gonzalez's jail served no penological purpose, violated Mr. Shelton's constitutional rights, and caused Mr. Shelton's death. ......................................................32

3.   Sheriff Gonzalez was deliberately indifferent in his implementation and maintenance of the unconstitutional conditions. ................................33

4.   Sheriff Gonzalez is not entitled to qualified immunity for implementing unconstitutional conditions of confinement in the Harris County Jail. ...............................................................................................36

**D.   Sheriff Gonzalez implemented unconstitutional policies, practices, and training programs in his jail for which he is not entitled to qualified immunity. ...............................................................................................38**

1.   Sheriff Gonzalez adopted practices in his jail that denied Type 1 diabetics insulin and blood glucose monitoring with deliberate indifference to their known and obvious consequences. ..........................39

2.   Sheriff Gonzalez failed to train his jailers on Type 1 diabetes and observing detainees despite knowing to a moral certainty such training was necessary to prevent detainee death. ................................................45

**VI. CONCLUSION ................................................................................................50**

## TABLE OF AUTHORITIES

**Cases**

*Behrens v. Pelletier*, 516 U.S. 299 (1996) ...............................................21

*Bell v. Wolfish*, 441 U.S. 520 (1979)........................................23, 33, 36

*Bishop v. Arcuri*, 674 F.3d 456 (5th Cir. 2012) ...............................41, 42

*Board of County Comm'rs of Bryan Cnty., Okl, v. Brown*, 520 U.S. 407 (5th Cir. 1997) ........................................................................................45, 48

*Bond v. Nueces Cnty., Tex.*, No. 20-40050, 2022 WL 4595000 (5th Cir. 2022).....49

*Brown v. Cain,* 546 Fed. Appx. 471 (5th Cir. 2013)………………………..28, 44

*Brown v. Miller*, 519 F.3d 231 (5th Cir. 2008) .............................1, 21, 22

*Burns v. City of Galveston, Tex.*, 905 F.2d 100 (5th Cir. 1990).......................20, 49

*City of Canton, Ohio, v. Harris*, 489 U.S. 378 (1989) ......................................45, 48

*Club Retro, L.L.C. v. Hilton*, 568 F.3d 181 (5th Cir. 2009) ...................................21

*Colle v. Brazos Cnty. Tex.*, 981 F.2d 237 (5th Cir. 1993)...............20, 25, 38, 44, 45

*Connick v. Thompson*, 563 U.S. 51 (2011)…………………………………42, 48

*Covington v. City of Madisonville, Tex.*, No. 18-20723, 812 Fed. App'x. 219 (5th Cir. 2020) ....................................................................................................43

*Darden v. City of Fort Worth, Tex.*, 880 F.3d 722 (5th Cir. 2018) ........................26

*Delaughter v. Woodall*, 909 F.3d 130 (5th Cir. 2018) ............................................32

*Domino v. Tex. Dep't. of Crim. Justice*, 239 F.3d 752 (5th Cir. 2001)...................44

*Duvall v. Dallas Cnty.*, 631 F.3d 203 (5th Cir. 2011)............................................24

*Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020) ....................................................38

*Estate of Davis ex rel. McCully v. City of N. Richland Hills,* 406 F.3d 375 (5th Cir. 2005) ........................................................................................39

*Estelle v. Gamble*, 429 U.S. 97 (1976)..................................................46

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................26

*Ford v. Anderson Cnty., Tex.*, 102 F.4th 292 (5th Cir. 2024) ...........25, 42

*Garcia v. City of Lubbock,* No. 21-11134, 2023 WL 4636896 (5th Cir. 2023)......46

*Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974) ....................................32

*Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372 (7th Cir. 2017) ...........48

*Hare v. City of Corinth, Miss.* (*Hare II*), 74 F.3d 633 (5th Cir. 1996) .............24, 38

*Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803 (5th Cir. 2017)..........40

*Hinojosa v. Livingston*, 807 F.3d 657 (5th Cir. 2015) ...................25, 26, 35, 36, 40

*Jauch v. Choctaw Cty, Miss.*, 874 F.3d 425 (5th Cir. 2017) .............25, 38

*Jones v. Cain*, 600 F.3d 527 (5th Cir. 2010) .........................................33

*Leatherman v. Tarrant Cnty. Narc. Intel. & Coord. Unit*, 507 U.S. 163 (1993) ....25

*Littell v. Houston Ind. Sch. Dist.*, 894 F.3d 616 (5th Cir. 2018) ...........47

*Marks v. Hudson*, 933 F.3d 481 (5th Cir. 2019) ...................................49

*McNeal v. LeBlanc*, 90 F.4th 425 (5th Cir. 2024)...................25, 28, 32, 36, 41, 42

*Montano v. Orange Cnty, Tex.,* 842 F.3d 865 (5th Cir. 2016) .............20, 29, 36, 37

*Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011).................................21

*Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575 (3rd Cir. 2003) ..................48

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012) .................................27

*Palmer v. Johnson*, 193 F.3d 346 (5th Cir. 1999)..................................26

*Partridge v. Two Unknown Police Officers of City of Houston, Tex.*, 791 F.2d 1182 (5th Cir. 1986)......................................................................................49

*Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001)..................42

*Ramirez v. Escajeda*, 921 F.3d 497 (5th Cir. 2019) ........................................1, 22, 23

*Sanchez v. Young Cnty.*, 956 F.3d 785 (*Sanchez II*) (5th Cir. 2020)...................... ...................................................................................19, 24, 30, 36, 37

*Scott v. Moore*, 114 F.3d 51 (5th Cir. 1997) ..........................................................34

*Shepard v. Hansford Cnty.*, 110 F.Supp.3d 696 (N.D. Tex. 2015) .........................34

*Shepherd v. Dallas Cnty.*, 591 F.3d 445 (5th Cir. 2009)................19, 31, 33, 36, 38

*Silva v. Donley Cnty., Tex.*, No. 93-1308, 32 F.3d 566 (5th Cir. 1994)............34, 49

*Stevenson v. Tocé*, 113 F.4th 494 (5th Cir. 2024) ...............................................1, 21

*Taylor v. Riojas*, 592 U.S. 7 (2020) .......................................................................26

*Thompkins v. Belt*, 828 F.2d 298 (5th Cir. 1987) ..................................................25

*Webb v. Livingston*, Nos. 14-40579, 14-40586, 14-40756, 618 Fed. Appx. 201 (5th Cir. 2015).............................................................................................25, 26

*Wigginton v. Jones*, 964 F.3d 329 (5th Cir. 2020) .................................................26

*Wilson v. Seiter*, 501 U.S. 294 (1991) ....................................................................32

*Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974)..................................................32

*Zantiz v. Seal,* No. 14-30069, 602 Fed. App'x. 154 (5th Cir. 2015) ......................23

**Statutes**

28 U.S.C. § 1292 .........................................................................................................1

42 U.S.C. § 1983 ...........................................................................................17, 18, 24

**Regulations**

37 TEX. ADMIN. CODE § 275.1 ................................................................29

37 TEX. ADMIN. CODE § 275.4 ................................................................15

## I.     JURISDICTIONAL STATEMENT

Defendant-Appellant fails to invoke the Court's limited jurisdiction over this interlocutory appeal based on qualified immunity. 28 U.S.C. § 1292; *Ramirez v. Escajeda*, 921 F.3d 497, 500-01 (5th Cir. 2019). The Court's jurisdiction on a motion to dismiss based on qualified immunity is limited to whether the facts as pled by Plaintiffs-Appellees—accepting all well-pled facts as true and drawing all inferences their favor—establish a violation of clearly established law. *Stevenson v. Tocé*, 113 F.4th 494, 501 (5th Cir. 2024). Because every argument of Defendant-Appellant Gonzalez requires the Court to entirely disregard Plaintiffs' operative complaint, this Court does not have interlocutory jurisdiction. *See Ramirez*, 921 F.3d at 501; *Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008).

## II.     STATEMENT OF ISSUES FOR REVIEW

1. Does this Court have jurisdiction over Defendant-Appellant Gonzalez's appeal where his requested relief requires the Court to ignore Plaintiffs' operative complaint in violation of binding precedent?

2. Did the District Court correctly find that Plaintiffs-Appellees have stated claims against Defendant-Appellant Sheriff Gonzalez in his individual capacity for the unconstitutional conditions of confinement he authorized in his jail for which he is not entitled to qualified immunity?

3.  Was the District Court also correct in finding that Plaintiffs-Appellees have additionally stated claims against Defendant-Appellant Sheriff Gonzalez for enacting numerous policies, practices, and lack-of-training programs at his jail with deliberate indifference to the serious medical needs of detainees like Matthew Shelton for which he is also not entitled to qualified immunity?

## III.  SUMMARY OF THE CASE

This is a case arising from deliberate indifference to a serious medical need brought against Harris County Sheriff Ed Gonzalez in his individual capacity for the dangerous conditions of confinement he authorized at the Harris County Jail as well as his policies, practices, customs, and lack-of-training programs he implemented in his jail that were the moving force of the agonizing death of Matthew Shelton from diabetic ketoacidosis. ROA.2733-2751; ROA.793-928.

### A. Factual Background

On March 27, 2022, Type 1 diabetic Matthew Shelton died of preventable diabetic ketoacidosis at the Harris County Jail after being denied insulin for over four days. ROA.2551; ROA.2733; *see also* ROA.799, 847 at ¶¶ 27, 290. Type 1 diabetes is a well-known endocrine disorder that requires administration of insulin and blood glucose checks (necessary to correctly dose insulin) multiple times a day, every day. ROA.800-01, ¶¶ 31-37. It is both inevitable and widely understood that a Type 1 diabetic denied insulin will develop diabetic ketoacidosis, suffer painfully,

and die within mere days, if not within hours. ROA.801, ¶ 35. Sheriff Gonzalez knew his jail would confine Type 1 diabetics like Matthew Shelton who would suffer serious injury and die without insulin and monitoring. ROA.814, 850, 857-58, ¶¶ 113, 306, 340.

In the years before Mr. Shelton entered his jail, Sheriff Gonzalez was personally and repeatedly put on notice that his jail was dangerous to detainees with Type 1 diabetes and other chronic conditions, yet he did nothing to change the conditions, policies, practices, customs, or training programs at his jail including his policy of understaffing, practice of jailers' non-monitoring detainees, and customs of denying diabetic detainees insulin and blood glucose monitoring. ROA.855-892. Notice that the conditions, policies, practices, and lack-of-training programs he implemented were dangerous came to Sheriff Gonzalez via at least 21 deaths (including 14 diabetics), at least four medically vulnerable detainees who suffered serious injury, the Department of Justice, numerous media articles, election debate questions he fielded, commissioned studies of the medical care in his jail, at least seven citations by the Texas Commission on Jail Standards (TCJS) related to deficient medical care and detainee monitoring, his personal participation in the medical care transition to Harris Health, and several lawsuits including one brought against the Sheriff by his own jailers so concerned about the dangerous conditions, policies, and practices in his jail that they directly admitted in their complaint to the

same practices Plaintiffs allege caused Matthew Shelton's death. ROA.825-27, 855, 857-63, 872-74, 881-86, 890, 914-15, ¶¶ 173-76, 182-83, 326-29, 336-44, 346-48, 350, 352, 355, 358, 359, 363, 371, 424-25, 427-30, 433, 479-83, 485-87, 489-99, 502, 504-18, 526-32, 625-27.

1.  *Sheriff Gonzalez knew the conditions, policies, practices, customs, and training programs in his jail denied insulin and blood glucose monitoring to Type 1 diabetics and did nothing to change them before they were inflicted on Matthew Shelton.*

Sheriff Gonzalez knew the medical care in Harris County Jail was dangerously deficient and unconstitutional before he ever took office. In the 2016 debate before his election as Harris County Sheriff, Gonzalez expressly acknowledged that the Harris County Jail had a concerning history of detainee deaths and that the jail's medical care needed to be redesigned, starting right when detainees came into the jail, if that pattern of death was to stop. ROA.858, 873, ¶¶ 342-344, 429. This pattern of deaths Sheriff Gonzalez spoke about during the debate included five diabetics—Mathes, Franklin, Phillips, Gomez, and Neelys—who had died in just the previous three years from complications of diabetes or medical conditions for which their diabetes was a contributing factor. ROA.872-73, ¶¶ 424(c)–(e), 425(h)-(i). His debate comments also showed he was aware of the widely-reported 2009 Department of Justice report that unequivocally found that medical care at the Harris County Jail was so deficient it violated the constitutional rights of detainees at the jail, had led to an "alarming" number of detainee deaths (including at least one

4

diabetic), and specifically placed detainees with chronic conditions like Type 1 diabetes at "unacceptable risk of death or injury." ROA.855, 873, ¶¶ 326-29, 427. During his campaign Sheriff Gonzalez also discussed the near-death of detainee Elsweisy, a Type 1 diabetic who nearly died of diabetic ketoacidosis after being denied insulin in the Harris County Jail and whose experience was detailed by the Houston Chronicle. ROA.857-58, 873, ¶¶ 336-41, 428.

After Sheriff Gonzalez took over as sheriff, he not only received but gave a presentation on a 2018 audit by outside entity Health Management Associates (HMA) that conducted an extensive review of the medical care at his jail and identified many of the same deficiencies for detainees with chronic conditions like Type 1 diabetes that the DOJ identified years before. ROA.859-60, 873, ¶¶ 346-47, 352, 429. Sheriff Gonzalez personally knew that in 2018, his jail medical staff were not evaluating or following up on detainees with Type 1 diabetes and other chronic conditions to ensure they were receiving necessary medications and monitoring, like insulin and blood glucose checks, and were not developing diabetic ketoacidosis. ROA.859-60, 873-74, ¶¶ 348, 350, 430. He also knew this placed Type 1 diabetics in grave danger. ROA.865, 913, 915, 916, 926, ¶¶ 384, 621, 627, 632, 679. Supporting HMA's conclusions, Sheriff Gonzalez knew that in just the two years between his becoming sheriff and his presenting on the HMA report, two additional diabetic detainees (Rachelle and Dansby) had died of medical conditions related to

their diabetes after not receiving insulin and blood glucose monitoring. ROA.872, ¶ 425(e)-(f).

In the two years following the 2018 HMA report, Sheriff Gonzalez continued to regularly discuss the jail's medical care with the Harris County Commissioner's Court and Harris Health, the public hospital district for the county. ROA.860, ¶ 354. During these same two years, Sheriff Gonzalez knew that an additional three diabetic detainees—Lewis, Romero, and Robinson—had died after not receiving insulin and blood glucose monitoring. ROA.872, ¶¶ 424(b), 425(c)-(e). Given the pattern of diabetic deaths that had continued unabated after the Sheriff took office, it was not surprising that in December 2020, the Sheriff's jail was cited by TCJS for violating minimum standards concerning detainee medications, including not administering insulin or documenting that the jail had provided insulin to diabetics who needed it to live. ROA.860, ¶ 355. The discussions between Sheriff Gonzalez, the Commissioner's Court, and Harris Health culminated in a plan to transition the direct provision of medical care from the Sheriff's Office to Harris Health. ROA.861, ¶¶ 358-59.

Transitioning direct provision of medical care from the Sheriff's Office to Harris Health took fourteen months during which three more diabetic detainees died (Lara, Tilman, and Windsor) after not receiving insulin and blood glucose monitoring in the Sheriff's jail. ROA.861, 863, 871-73, ¶¶ 358, 371, 424(a), 425(a)-

(b). During the same fourteen months, HMA conducted a new audit and issued a 2021 report that was reviewed by Sheriff Gonzalez finding many of the same violations. ROA.862, ¶ 363. Each of the medical staff who became Harris Health employees and contractees effective March 1, 2022 were employed by or contracted with Sheriff Gonzalez's office before that date and so were trained on the policies and practices implemented and adopted first by Sheriff Gonzalez. ROA.802, 804-05, 807-08, 863, ¶¶ 40, 53, 58, 61, 77, 369.

In 2021 and 2022, Sheriff Gonzalez personally participated in the fourteen-month transition of medical care from his office and employees to Harris Health's purview. ROA.874, ¶ 433. He learned during the lengthy process of planning for and transitioning care (and was actually already aware by virtue of the reports, TCJS citation, and numerous deaths he reviewed) that in March 2022 his jail had policies, practices, and customs that denied Type 1 diabetics life-sustaining insulin and blood glucose monitoring including: (a) prescribing insulin as only a single-dose order rather than a repeating order; (b) ordering blood glucose monitoring as single orders or for no longer than three days at a time; (c) limiting blood glucose monitoring to only twice a day though more frequent checks are necessary to avoid injury or death; (d) housing Type 1 diabetics without confirming insulin and blood glucose monitoring is ordered; (e) treating blood glucose between 300 mg/dL and 350 mg/dL as normal though it requires immediate evaluation, monitoring, and treatment; and

(f) not notifying a doctor or other provider when a Type 1 diabetic detainee had a blood glucose over 300 mg/dL, asked for life-sustaining insulin, received a medical pass but did not come to the clinic, or skipped meals. ROA. 904-05, ¶ 595; *see also* ROA.802-05, 809-13, 815-17, 821, 850, 874-78, 880, ¶¶ 44, 51, 57, 60, 86, 87, 90, 94, 100-01, 107, 118-19, 127, 130, 155, 304, 434-35, 437-38, 440-43, 445-46, 448-49, 451-52, 454-55, 457-58, 460-61, 473-74. He also knew that his jail's medical providers were trained in accordance with these dangerous policies and practices, knew that he had chosen to implement a training program for his jailers that provided no training on recognizing signs or symptoms of low or high blood glucose or diabetic ketoacidosis or the need for Type 1 diabetics to receive insulin multiple times a day, and actually knew that these policies, practices, and lack-of-training program further endangered Type 1 diabetic detainees. ROA. 904-05, ¶ 595; *see also* ROA.804-05, 807-08, 810, 814, 816, 850, 863-71, 874-80, ¶¶ 53, 58, 61, 77, 94, 113, 126, 306, 373-76, 378-81, 383-86, 388-89, 391, 393, 395-98, 400-03, 405-06, 408-11, 413-15, 417-19, 421, 436, 439, 444, 447, 450, 453, 456, 459, 462-72, 476.

Despite actually being aware of these dangerous conditions, programs, policies, customs, and lack-of-training programs, and recognizing they had killed diabetics in the past and continued to endanger them, Sheriff Gonzalez neither changed them nor did anything to protect diabetic detainees. ROA.813, 850, 857-58, 864-69, 871-80, 906, 909-10, ¶¶ 113, 306, 340, 343-44, 374, 379, 384, 391, 396,

401, 409, 424-25, 434-76, 597, 607-09. Instead, he authorized Harris Health to continue his original policies and practices. ROA.864-69, 871-80, 906, 909-10, ¶¶ 379, 384, 391, 396, 401, 409, 424-25, 434-76, 607-09.

Accordingly, when Matthew Shelton voluntarily surrendered himself to Sheriff Gonzalez's jail on March 22, 2022, medical staff and jailers followed each and every one of the Sheriff's dangerous policies, practices, and lack-of-training programs described in Plaintiffs' complaint, resulting in Shelton being denied insulin and blood glucose monitoring until he died after four-plus days of agony on March 27, 2022. Specifically, the doctor and physician's assistant who assessed Mr. Shelton on March 22nd and March 23rd issued only single-dose orders of insulin, short-term orders for blood glucose monitoring no longer than three days, and blood glucose monitoring no more frequently than twice a day. ROA.803-07, 810-12, ¶¶ 50-52, 55, 56, 63, 65, 69, 73, 75, 76, 94, 96, 104-05. On March 23, the Sheriff's jailers then transferred him out of the jail's processing center and into a single cell in the main jail without ongoing orders for insulin and blood glucose monitoring because no one checked his records to confirm whether he had ongoing orders. ROA.813, ¶ 107. As a result, the last time Matthew Shelton received the insulin he needed multiple times a day to survive was March 23, 2022 at 3:45 a.m. ROA.813, ¶ 106; *see also* ROA.815, ¶ 121.

On March 23rd and 24th, when Mr. Shelton's blood glucose was measured

over 300 mg/dL—indicating the need for immediate evaluation, monitoring, and treatment—jail nurses instead treated the result as normal and informed no doctor of the result or that Mr. Shelton was asking for insulin. ROA.816, 818, ¶¶ 127-28, 136, 138, 140. Though the nurse gave Mr. Shelton a medical pass in the early morning of March 24th, no one ever followed up when he did not make it to the clinic and no jailer got him to the clinic despite knowing he desperately need to go. ROA.819-22, ¶¶ 141-42, 147-151, 156. *see also* ROA.811-12, ¶¶ 99, 103. Thus, Mr. Shelton was not seen by anyone who could prescribe insulin and his blood glucose only continued to rise. ROA.817, ¶¶ 133, 160. The last time Mr. Shelton's blood glucose was checked was shortly before 2 a.m. on March 24, 2022. ROA.818, 822, ¶¶ 139, 161.

Without insulin, Mr. Shelton developed deadly diabetic ketoacidosis and suffered insatiable thirst, nausea, vomiting, weakness, shortness of breath, debilitating confusion, and agonizing pain over the next several days. ROA.800, 824, 826-29, 831-33, 835-43, ¶¶ 31-33, 35, 168, 178, 186, 188, 196-97, 203, 210, 217, 224, 230, 232, 234, 236, 238, 242-43, 245, 247, 249, 252, 254, 256, 258, 263-64. Because the Sheriff did not train his jailers on recognizing the symptoms of diabetic ketoacidosis or high or low blood glucose, the vital importance of insulin to a Type 1 diabetic, or to report when diabetic detainees asked for insulin or missed meals, the jailers who heard Mr. Shelton say he was diabetic and ask for insulin disregarded his alarming physical symptoms and the meals piling up in his cell and never got

him medical care between March 24th and March 27th. ROA.824, 826, 830, 832-33, ¶¶ 169-70, 178, 180-81, 199-200, 210-11, 213-14, 216,

Matthew Shelton died a torturous death, disregarded and in agony, on March 27, 2022 of diabetic ketoacidosis after being denied insulin for more than four days in Sheriff Gonzalez's jail. ROA.843, 846, 847, ¶¶ 264, 288-290. After Mr. Shelton's death, yet another diabetic detainee died as a result of these same conditions, policies, practices, and training programs and TCJS cited the jail for the dangerous medication practices that caused Mr. Shelton's death. ROA.851-52, 871, ¶¶ 310-11, 313, 422-23.

> 2. *Sheriff Gonzalez knew his policies, practices, and customs of understaffing and jailers' non-monitoring detainees placed detainees at substantial risk of harm, yet did nothing to correct them before Matthew Shelton was subjected to them.*

Compounding Sheriff Gonzalez's dangerous medical policies, practices, customs, and patently deficient training programs was his longstanding policy of understaffing his jail and his jailers' practice of non-monitoring detainees which placed detainees with medical or psychiatric vulnerabilities at substantial risk of injury or death.

Sheriff Gonazlez knew that between 2013-2014, jailers' non-monitoring of detainees resulted in two deaths of medically or psychiatrically vulnerable detainees, Guzman by suicide and Bonier from a treatable medical emergency, both of which could have been prevented if jailers had been monitoring them. ROA.881-82, 886,

¶¶ 479-80, 485-87, 507. The Harris County Deputies Organization publicly identified in media articles that Guzman's death was caused by the jail's policy of understaffing. ROA881-82, ¶¶ 479, 481. Goodwin, a psychiatrically vulnerable detainee, was found during this same time by TCJS inspectors in a cell he had been continually confined in for two months with no working toilet, surrounded by trash, swarms of bugs, and feces. ROA.881, 886, ¶¶ 482, 507. Between these three incidents, at least six different jailers were caught fabricating records, indicating they had completed face-to-face monitoring rounds when no rounds had been done. ROA.881-82, ¶¶ 479, 480, 482-83, 485-86. These deaths and jailer fraud received extensive media attention and Sheriff Gonzalez either knew about them before he became Sheriff or he learned about them shortly after, including the jailers' practice of fabricating observation checks. ROA.882, 886, ¶¶ 487, 507. In the same vein, in November 2015, the Houston Chronicle reported that in just the previous nine months, its reporters identified at least 35 instances where jailers did not complete or fabricated detainee observation checks. ROA.882, ¶ 489.

When Young died in February 2017 shortly after Sheriff Gonzalez took over as Sheriff, the Texas Rangers determined a jailer fabricated 21 different observation checks which the jailer blamed on understaffing. ROA.882-83, 886, ¶¶ 489, 490, 507. Less than two months later, two detainees were locked inside a van for ten hours while jailers falsely marked them on their unit during hourly checks, garnering the

Sheriff's jail a TCJS citation for failing to observe detainees. ROA.883, 886, ¶¶ 491, 492, 507. This non-monitoring risked serious injury that was only avoided because it occurred in early spring rather than the heat of a Texas summer. *Id.* Later that same year, Prater, a psychiatrically vulnerable detainee awaiting transfer to a mental health facility, obtained a razor and severed his penis while jailers were not monitoring him as required. ROA.883, 886, ¶¶ 493, 507. Before the year was over, detainee Alsaedy covered the window to his cell and died by suicide while a jailer falsely documented he had observed him face-to-face and that Alsaedy was fine. ROA.883, ¶ 494. The non-observation of Alsaedy and the falsified observation earned Sheriff Gonzalez's jail its second TCJS citation of 2017. ROA.884, 886, ¶¶ 495, 507.

The following year, in August 2018, detainee Lyons left her unit and died by suicide while jailers logged that they had observed her on the unit. ROA.884, ¶ 496. Lyons' death and the falsified observation resulted in yet another TCJS citation for Sheriff Gonzalez's jail. ROA.884, 886, ¶¶ 497, 507. In 2020, a detainee injured the year before sued the Sheriff for injuries he sustained when jailers failed to monitor him, and the case settled shortly after Mr. Shelton died. ROA.884, ¶¶ 498-99.

In 2020, the Sheriff switched from paper observation logs to an electronic scanning system called CorreTrak specifically because he knew his jailers were fabricating observation rounds, but he intentionally chose not to do not do anything

to correct the underlying policy of understaffing or practices of non-observation of detainees and fraud. ROA.884-85, ¶ 501. Yet it was apparent to the Sheriff by the end of that same year that CorreTrak had done nothing to address the practice of non-monitoring as TCJS cited Sheriff Gonzalez's jail again for not observing detainees at state-mandated intervals. ROA.885-86 ¶¶ 502, 507. Two more medically vulnerable detainees, Simmons and Ward, died in 2021 when jailers failed to observe them for several hours after they had been beaten (at least one of them by jailers themselves) and the jailers instead fabricated their observation rounds. ROA.885-86, ¶¶ 504-07. TCJS cited Sheriff Gonzalez's jail again in April 2021 for jailers' intentional fabrication of observation rounds in lieu of observing detainees face-to-face for signs of distress, again putting Sheriff Gonzalez on notice that switching to CorreTrak had done nothing to solve the dangerous conditions or the constitutional violations. *Id*.

Less than a year before Mr. Shelton died, the Sheriff was sued by his own jailers because of his dangerous understaffing policy which had led to jailers' practice of marking observations complete without actually observing detainees. ROA.886-88, ¶¶ 508-18. At least five of the jailer whistleblowers directly admitted in their complaint that they were not monitoring detainees face-to-face at state-mandated intervals and were instead fraudulently logging observation rounds complete on CorreTrak without actually looking at detainees. ROA.886-87, ¶¶ 509-

12, 514-15. Thus Sheriff Gonzalez knew that CorreTrak had not only done nothing to correct his jailers' non-monitoring practice but had only worsened their fraud practice as jailers were logging rounds under others' names, obscuring the identity of the jailer who had claimed to have completed (and instead fabricated) a particular observation. ROA.887, ¶ 514. Two other *Doe* whistleblowers (one a supervisor) admitted that the staffing reports submitted to TCJS were falsified to make it appear Sheriff Gonzalez's jail was meeting state-mandated staffing ratios when it was not and that they too were not observing detainees at state-mandated intervals as understaffing prevented them from doing so. ROA.887, ¶¶ 513, 515.  Yet Sheriff Gonzalez disregarded his obligation to supervise his jailers and did nothing to fix the dangerous practices or his underlying understaffing policy. ROA.884-85, 888, 906, 913, 915, ¶¶ 501, 516-17, 526-29, 532, 597, 621, 627, 629.

Just two months later, in November 2021, TCJS cited the jail for not having sufficient staff to perform necessary duties, violating state minimum staffing and safety regulations. ROA.888, ¶ 517; *see also* 37 TEX. ADMIN. CODE § 275.4. Sheriff Gonzalez was aware of this citation, the dangers to detainees it counseled, and why it was issued—in fact, he talked about it during a press conference a few weeks later in December 2021. ROA.888, ¶ 518. During the press conference less than three months before Matthew Shelton's death, Sheriff Gonzalez directly admitted that his jail staffing just a few months earlier was "desperation mode," his jail was still

understaffed, and that detainees were in jeopardy as his jailers would continue to not monitor detainees at his jail's current staffing levels. *Id*.

Yet even with this decade of deaths and serious injuries, TCJS citations, and a lawsuit filed by his own jailers admitting they were not monitoring detainees, Sheriff Gonzalez breached his supervisory responsibilities and did nothing to change his understaffing policy or correct his jailers' pervasive and ongoing practices not only of not monitoring detainees but of falsifying records to cover up their dangerous non-monitoring. ROA.890, ¶¶ 526-532. Instead, these conditions, practices, policies, and customs of understaffing and non-monitoring continued in March 2022. ROA.825-27, 914-15 ¶¶ 173-76, 182-83, 625-27.

As a result of these same policies and practices, and Sheriff Gonzalez's deliberate failure to supervise his employees, every single one of the 18 jailers who were obligated to observe Mr. Shelton face-to-face hourly at least 96 times over his last four days in the jail instead falsified observation checks and intentionally did not observe him face-to-face. ROA.800, 825-29, 831-32, 834, 838-44, 891, ¶¶ 29, 177, 184-85, 187, 189, 193-95, 205-09, 219-239, 242-49, 255-56, 259-63, 267-69, 534; *see also* ROA.838, 888, ¶¶ 239-41, 519 (the jail was understaffed and all jailers were working overtime when Mr. Shelton died); ROA.847, ¶ 294 (jailers conspired to fabricate other documents to cover wrongdoing after Mr. Shelton died). As had happened with the previous deaths of detainees Guzman, Bonier, Young, Alsaedy,

Lyons, and Simmons, Gonzalez's jailers documented that they observed Mr. Shelton face-to-face alive hours after he had already died and had in fact developed rigor mortis. ROA.800, 843, 845-46, 881-84, ¶¶ 30, 264, 266, 280-81, 285, 480, 486, 490, 495-96, 504. Even after Mr. Shelton died, Sheriff Gonzalez did not correct his jail's conditions, his understaffing policy, or his jailers' non-monitoring and fraud practices, leading to at least one more death with fabricated observation rounds and three additional TCJS citations. ROA.889, ¶¶ 524-25. Instead, video and other evidence establishing the constitutional violations of Matthew Shelton's rights was intentionally destroyed to cover up the dangerous practices. ROA.825, 829, 844-45, 847-48, 853-54, 892-95, ¶¶ 177, 195, 275, 291-97, 316-24, 537-50.

If even one of the jailers had actually observed Mr. Shelton and his obvious medical distress between March 24 and March 27, 2022 and gotten medical help, he would not have died. ROA.827, 829, 831-32, 834-43, 892, ¶¶ 185-86, 195-96, 204, 208-09, 222-238, 242-49, 252-63, 535-36.

## B. Procedural Background

This interlocutory appeal arises from Plaintiffs' claims under 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act (Rehab Act) against Harris County Sheriff Ed Gonzalez in his individual capacity, Harris County, Harris Health, and 18 individual jailers. ROA.793-799, ROA.898-921. Only Plaintiffs' 42 U.S.C. § 1983 claims against

Defendant-Appellant Sherrif Gonzalez are the subject of this appeal. ROA.2756-58.

On December 18, 2024, the District Court denied the motions to dismiss filed by Harris County and Harris Health as to most of Plaintiffs' ADA, Rehab Act, and 42 U.S.C. § 1983 claims.[1] ROA.2351-53. The Court granted Harris County's motion only as to Plaintiffs' denial-of-access claim based on Harris County's destruction of evidence, finding it was not yet ripe. *Id*.

On March 6 and May 14, 2025, the District Court denied the motions to dismiss filed by 18 of the Sheriff's jailers who ignored Mr. Shelton's medical complaints, refused him care, and otherwise exhibited a wanton disregard for his constitutional rights. *See* ROA.2551-67, 2592-2619.

On September 30, 2025, the District Court denied Sheriff Gonzalez's motion to dismiss the claims brought against him in his individual capacity.[2] ROA.2733-51. The District Court determined that Plaintiffs alleged unconstitutional conditions of confinement and two episodic-acts-or-omissions claims against Sheriff Gonzalez based on his jail's conditions and his policies, practices, customs, and lack-of-training programs that he implemented with deliberate indifference to the known and obvious constitutional violations that would occur. ROA.2737-39, 2743-45, 2747-

---

[1] Harris Health was dismissed from the suit on January 22, 2026 after paying a settlement to resolve the claims against it.

[2] The District Court granted the Sheriff's motion without prejudice as to Plaintiffs' denial-of-access claims as it had done with Plaintiffs' same claims against the county, finding them not yet ripe. ROA.2734, n.3.

49. The District Court denied Sheriff Gonzalez qualified immunity as to all three claims. ROA.2739-43, 2745-47, 2749-2750.

### IV.  SUMMARY OF THE ARGUMENT

The Court should dismiss the appeal as it lacks jurisdiction because Sheriff Gonzalez's relief requires the Court to throw out Plaintiffs' detailed, well-pled complaint in violation of binding precedent.

Even if the Court considers the merits of Sheriff Gonzalez's appeal, the Court should affirm the District Court's ruling for two reasons.

First, as the District Court found, Plaintiffs sufficiently allege that Sheriff Gonzalez implemented unconstitutional conditions of confinement in his jail through his policy of understaffing, his jailers' pervasive practices of non-monitoring and fraud, and his policies that denied Type 1 diabetic detainees insulin and blood glucose monitoring. Sheriff Gonzalez actually knew the conditions had killed and seriously injured diabetics and other medically vulnerable detainees in the past, actually drew the inference that these conditions would continue to injure and kill detainees in the future if they continued, yet affirmatively chose to do nothing to correct the conditions but instead allowed them to fester. These conditions were the moving force of Matthew Shelton's agonizing death of diabetic ketoacidosis. As the District Court correctly identified, *Shepherd v. Dallas Cnty.*, 591 F.3d 445 (5th Cir. 2009), *Sanchez v. Young Cnty.*, 956 F.3d 785 (5th Cir. 2020), and *Montano v.*

*Orange Cnty, Tex.,* 842 F.3d 865, (5th Cir. 2016) each put Sheriff Gonzalez on notice that he could not constitutionally subject Type 1 diabetics to conditions in his jail that would deny them life-sustaining medical care and monitoring and thus is not entitled to qualified immunity. ROA.2741-43.

Second, the District Court confirmed that Plaintiffs also stated at least two episodic-acts-or-omissions claims based on Sheriff Gonzalez's policy of denying Type 1 diabetics insulin and blood glucose monitoring and his policy decision to provide no training to his jailers on monitoring detainees including Type 1 diabetics. The Sheriff was not only aware of these policies, but actually knew they had each endangered diabetic detainees, had each killed and injured diabetics in the past, and were both all but guaranteed to continue to injure and kill diabetic detainees if they continued. Nonetheless, Sheriff Gonzalez did nothing to correct his dangerous policies or lack-of-training program. The District Court correctly identified that *Colle v. Brazos Cnty. Tex.*, 981 F.2d 237 (5th Cir. 1993) put Sheriff Gonzalez on notice almost three decades before Mr. Shelton died that policies and practices that denied Type 1 diabetics access to necessary medical care and monitoring would unconstitutionally deprive them of their constitutional right to not have their serious medical needs met with deliberate indifference. ROA.2744-47. As to his lack-of-training program, *Burns v. City of Galveston, Tex.*, 905 F.2d 100 (5th Cir. 1990) likewise informed Sheriff Gonzalez decades before Matthew Shelton entered his jail

that he could not refuse to train his jailers to recognize and not ignore obvious medical needs of detainees with known, demonstrable, and serious medical conditions like Type 1 diabetes. ROA.2749-50. Accordingly, the Sheriff is not entitled to qualified immunity on either claim and the Court should affirm the District Court's order denying the Sheriff's motion.

## V.    ARGUMENT

### A. Standard of Review

An order denying a motion to dismiss based on qualified immunity is immediately appealable only "to the extent it turns on an issue of law." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 311 (1996)). While the Court reviews a denial of a motion to dismiss based on qualified immunity *de novo*, the Court is "restricted to determining whether the facts pleaded establish a violation of clearly-established law." *Stevenson v. Tocé*, 113 F.4th 494, 500-01 (5th Cir. 2024) (quotation omitted); *see also Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008). Accordingly, the Court accepts as true all well-pleaded facts of the nonmovant, draws all inferences in favor of the non-moving party, and views all facts and inferences in the light of the non-moving party. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

### B. Sheriff Gonzalez's brief fails to invoke the Court's interlocutory jurisdiction as it rejects Plaintiffs' alleged facts.

Sheriff Gonzalez's refusal to accept the facts as detailed by Plaintiffs fails to

invoke the jurisdiction of the court, thus the Court should dismiss his appeal. *See Ramirez*, 921 F.3d at 501; *Brown*, 519 F.3d at 238.

The entirety of Sheriff Gonzalez's factual summary recites only Plaintiffs' allegations against other parties not in front of this Court, while entirely omitting Plaintiffs' detailed facts as to his knowledge of at least 23 other deaths in his jail, numerous serious injuries, a scathing DOJ report, two audits of the medical care in the Sheriff's jail, countless media articles, at least 7 TCJS citations, a federal lawsuit filed against him by his own jailers concerned about dangerous conditions in his jail and admitting to dangerous practices, and his own admissions on the campaign trail and at a press conference just a few months before Matthew Shelton died in his jail. *Compare Appellant's Br.,* pp. 2-8 (nowhere containing "Sheriff" or "Gonzalez" in the entirety of his factual summary) *with* ROA.2739, 2745, 2748 (collectively citing Plaintiffs' amended complaint pp. 7-121, corresponding to ROA.799-913).

It was these allegations about the Sheriff's own knowledge and personal role in implementing his jail's conditions, policies, practices, customs, and training programs that the District Court relied on to deny the Sheriff's motion. Specifically, the District Court cited Plaintiffs' "lengthy specifics of past deaths and medical emergencies" related to the identified unconstitutional conditions of confinement, Plaintiffs' plausible allegations that Sheriff Gonzalez was subjectively aware of "41 different practices that denied insulin and blood glucose monitoring to diabetic

detainees and the ongoing danger they posed to similar detainees in the jail," and the "jail's history of death, injury, and citation…[that] establish that Gonzalez knew with substantial certainty" that his lack-of-training program would result in serious injury or death for diabetic detainees. ROA.2739, 2745, 2748. Yet rather than respond to the facts Plaintiffs pled and the District Court relied on, Sheriff Gonzalez presents only Plaintiffs' allegations against other parties and then asserts that those same third-party allegations are too conclusory, non-specific, and implausible to support liability against him. *Appellant's Br.* at pp. 11, 13.

As the factual foundation of the Sheriff's appeal requires the Court to ignore Plaintiffs' detailed, well-pled facts establishing not only a dangerous pattern, but his knowledge; his personal role in implementing the dangerous conditions, policies, practices, and training programs; his deliberate indifference; and moving-force causation as to each of Plaintiffs' claims, the Court lacks jurisdiction over the appeal and should dismiss it outright. *See Ramirez,* 921 F.3d at 501 (dismissing appeal where defendant asked Court to reject those plaintiffs' facts); *see also Zantiz v. Seal,* No. 14-30069, 602 Fed. App'x. 154, 160 (5th Cir. 2015) (affirming denial of motion to dismiss where defendant attacked accuracy of facts as pled).

### C. Sheriff Gonzalez implemented unconstitutional conditions of confinement at his jail and is thus not entitled to qualified immunity.

As a pre-trial detainee, Matthew Shelton had a constitutional right to not be subjected to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Where a jail

"condition is not reasonably related to a legitimate goal—if it is arbitrary and purposeless—a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees." *Id.* Accordingly, plaintiffs state a claim for unconstitutional conditions of confinement when they identify a condition—a rule, practice, identifiable condition, or sufficiently extended or pervasive pattern of misconduct by jail officials—that is not reasonably related to a legitimate government interest and that caused the constitutional violation. *Sanchez v. Young Cnty., Tex.* (*Sanchez II*), 956 F.3d 785, 791 (5th Cir. 2020) (citing *Duvall v. Dallas Cnty.*, 631 F.3d 203, 207 (5th Cir. 2011)). Where plaintiffs have done so, the intent to punish is presumed by incarcerating the detainee in the known dangerous conditions. *Hare v. City of Corinth, Miss.* (*Hare II*), 74 F.3d 633, 644 (5th Cir. 1996). Where, as here, plaintiffs identify multiple, overlapping practices that had a "mutually enforcing effect" that deprived a detainee of his basic needs, courts consider how the alleged individual policies and practices work together within the system. *Sanchez II*, 956 F.3d at 795 (citations omitted).

Supervisory jail officials like Sheriff Gonzalez can be liable under § 1983 not only when they are personally involved in the deprivation of the detainee's rights but also when they "implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional

violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (internal quotations and citation omitted). Plaintiffs sufficiently allege a supervisory official is liable when they identify "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Jauch v. Choctaw Cty, Miss.*, 874 F.3d 425, 435 (5th Cir. 2017); ROA.2738-39, 2744-45; *see also* ROA.805, 821, 850, 854-92, 911-921. If those elements are satisfied, they establish individual supervisory liability as to the policymaker, Gonzalez.[3] *See, e.g.*, *Colle v. Brazos Cnty., Tex.*, 981 F.2d 237, 246 (5th Cir. 1993) (*overruled on other grounds by Leatherman v. Tarrant Cnty. Narc. Intel. & Coord. Unit*, 507 U.S. 163, 165 (1993)); *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015). Plaintiffs sufficiently allege a jail official is deliberately indifferent for implementing or maintaining unconstitutional conditions of confinement if they allege he knows the conditions placed detainees at substantial risk of serious harm, he drew the inference

---

[3] *See also, e.g., Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 320-32 (5th Cir. 2024) (district court erred in denying motion to amend complaint where proposed amendment stated colorable individual supervisory liability claims against sheriff including enactment of policy of delaying care for detainees with serious medical needs); *McNeal v. LeBlanc*, 90 F.4th 425, 431-32 (5th Cir. 2024) (per curiam) (allegations that prison official retained flawed trainings and policies stated claim against him in his individual capacity); *Webb v. Livingston*, Nos. 14-40579, 14-40586, 14-40756, 618 Fed. Appx. 201, 208 n.6 (5th Cir. 2015) (allegation prison officials failed to promulgate necessary and adequate policies despite knowing risks to detainees without them could support imposition of supervisory liability).

that such potential for harm existed, and yet he disregarded that risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A substantial risk of harm may be inferred if the risk is sufficiently obvious. *Id.*

A government official is not entitled to qualified immunity on conditions of confinement if he violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.[4] *Hinojosa*, 807 F.3d at 669. Constitutional rights are "clearly established" by "controlling authority—or a robust consensus of cases of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Wigginton v. Jones*, 964 F.3d 329, 355 (5th Cir. 2020). A plaintiff, however, does not need to produce "a case directly on point," as long as existing precedent has placed the conduct beyond debate. *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 727 (5th Cir. 2018) (citations omitted). The central concept is "fair warning"—"the law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then

---

[4] It is thus not the case, as Sheriff Gonzalez asserts, that conditions of confinement cases are appropriate only against municipalities, not individuals. *Compare Appellant's Br.,* p. 12 *with Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (reversing grant of summary judgment to supervisory prison official sued in his individual capacity for inflicting filthy, unconstitutional conditions of confinement); *Palmer v. Johnson*, 193 F.3d 346, 353-54 (5th Cir. 1999) (per curiam) (denying summary judgment to prison officials sued in individual capacities for unconstitutional conditions of confinement); *Webb*, 618 Fed. Appx. at 208 n.6 (allegation prison officials failed to promulgate necessary and adequate policies despite knowing risks to detainees without them could support imposition of supervisory liability).

before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012).

### 1. Sheriff Gonzalez's practices of understaffing, jailer non-monitoring, and denying insulin and blood glucose monitoring at his jail created dangerous conditions of confinement of which he was aware.

Plaintiffs' complaint identifies three mutually reinforcing, sufficiently pervasive customs of which Sheriff Gonzalez was personally aware, that served only to endanger and punish, which he did nothing to correct, and that were the moving force of Mr. Shelton's torturous suffering and death: 1) the Sheriff's longstanding policy of understaffing his jail, 2) his officers' pervasive practice of non-monitoring detainees, and 3) customs that denied insulin and blood glucose monitoring to diabetics. ROA.2738-39; *see also* ROA.854-92, 911-21. Because Plaintiffs allege the Sheriff personally implemented these conditions and was personally deliberately indifferent in continuing them despite actually knowing they endangered detainees, Plaintiffs do not bring a *respondeat superior* claim against the Sheriff.[5] Sheriff

---

[5] Contrary to the Sheriff's briefing, the District Court's order was explicitly not based on *respondeat superior* and Plaintiffs never attempted to bring *respondeat superior* claims against the Sheriff. *Compare Appellant's Br.*, p. 12 *with* ROA.2743 (acknowledging *respondeat superior* is not a basis for policymaker liability); ROA.2744 (finding Plaintiffs alleged liability based on a deficient policy and failure to train or supervise) and ROA.805, 814, 821, 858-60, 862, 864, 866-92, 912-21, ¶¶ 60, 113, 155, 343-52, 363, 374-91, 393-431, 433-78, 489-536, 615, 619-621, 623-36, 647, 649-50, 653, 655-56. Sheriff Gonzalez thus fails to identify any error of the

Gonzalez's assertions of ignorance as to these conditions categorically ignore Plaintiffs' allegations that he was actually aware of all three customs or practices and knew the practices endangered detainees, and are directly contradicted by Plaintiffs' complaint. *Compare Appellant's Br.*, p. 11 (citing only six pages of Plaintiffs' 136-page complaint) *with* ROA.912-21, ¶¶ 615, 619-621, 623-36, 647, 649-50, 653, 655-56.

First, as to his understaffing policy, the Sheriff personally admitted in the December 2021 press conference that his jail was understaffed and that he knew detainees would go unmonitored as a result. ROA.888, ¶ 518. His knowledge that understaffing would all but guarantee his jailers would not monitor detainees who would then be injured or die is further highlighted by the admissions of his own jailers in the *Doe* complaint, at least one TCJS citation explicitly tying understaffing to jailers' non-monitoring, and the deaths of Guzman and Young, both of which jailers explicitly blamed on the pressures of being understaffed. ROA.881-83, 886-88, ¶¶ 481, 490, 508-517; *see also* ROA.889, ¶ 523; *McNeal*, 90 F.4th at 429-30 (supervisor received notice of constitutional violation from previous lawsuit and reports).

Second, the Sheriff knew there was an entrenched and pervasive custom of

---

District Court or in Plaintiffs' pleadings that support reversal regarding *respondeat superior*. *See Brown v. Cain,* 546 Fed. Appx. 471, 475 (5th Cir. 2013).

jailers' non-monitoring detainees at least every hour face-to-face for signs of medical distress and deliberately falsifying records to hide practice. ROA.881-88, ¶¶ 479-80, 485-87, 491-97, 502, 504-16, 518; *see also* 37 TEX. ADMIN. CODE § 275.1. In December 2021, he publicly admitted to knowing this practice was the obvious result of understaffing shortly after he received the *Doe* complaint in which numerous jailers and jail supervisors informed him that they were not only not monitoring detainees but falsifying staffing and observation records submitted to a state watchdog agency. ROA.886-88, ¶¶ 508-516, 518. These admissions were consistent with what Sheriff Gonzalez already knew: in the years before Mr. Shelton died, eight detainees had died of preventable causes while they were unmonitored, two more were seriously injured, and his jail had been cited at least six times for non-monitoring detainees.[6] ROA.881-86, ¶¶ 479-80, 485-87, 491-97, 502, 504-07.

Indeed, even without this extensive history, Plaintiffs' allegations concerning the 18 jailers' uniform conduct of non-monitoring and falsifying observation checks as well as the jail's "losing" video of the days before Mr. Shelton's death sufficiently identifies the pervasive condition and pattern of non-monitoring at the Sheriff's jail and his knowledge of it. ROA.800, 825-29, 831-32, 834, 838-44, 889, 891, ¶¶ 29,

---

[6] Plaintiffs are not required to identify a pattern of deaths and other violations to state a claim for unconstitutional conditions of confinement. *See Montano v. Orange Cnty, Tex.*, 842 F.3d 865, 876 (5th Cir. 2016) (evidence of other instances is not required to succeed on a conditions of confinement case). Nonetheless, they have done so. *See* pp. 2-17.

177, 184-85, 187, 189, 193-95, 205-09, 219-23, 226-39, 242-49, 255-56, 259-63, 267-69, 520-22, 534. In *Sanchez II*, this Court noted that a reasonable jury could conclude, based on precisely the same kind of evidence Plaintiffs credibly allege exists here—"inexplicably missing" video and discrepancies between electronic cell check logs and the limited available video—that jailers were covering up their failure to monitor and that such dishonesty and coverup was typical of sufficiently extended or pervasive misconduct to establish unconstitutional conditions of confinement. *Sanchez II*, 956 F.3d at 793.

Sheriff Gonzalez knew that his understaffing policy and his jailers' practice of non-monitoring detainees put all detainees at risk of substantial harm, and knew it was particularly dangerous for detainees with medical or psychiatric vulnerabilities whose lives depend on monitoring for someone to notice if they suffered a medical emergency—like Mr. Shelton and detainees Guzman, Bonier, Goodwin, Young, Prater, Alsaedy, Lyons, Flores, Simmons, and Ward before him. ROA.881-86, 890, 891, 913, ¶¶ 479, 480, 482, 483, 485-87, 489, 490, 493-99, 504-507, 528, 532, 621. Despite knowing of the pervasive practice and the substantial risks it posed, Sheriff Gonzalez did absolutely nothing to correct the non-monitoring practice. ROA.885, 888, 913-15, 919, ¶¶ 516, 517, 621, 623, 624, 626, 627, 629, 647. The Sheriff's acquiescence to the jailers' known pervasive misconduct is itself indicative of the existence of the practice. *Sanchez II*, 956 F.3d at 793.

Third, Plaintiffs identified a series of overlapping, dangerous policies, practices, and training programs implemented by Sheriff Gonzalez and with his knowledge regarding how medical staff in his jail ordered insulin and blood glucose monitoring for Type 1 diabetics, how medical staff and jailers notified (or not) doctors that a detainee was asking for or needed insulin, and how jailers were not trained to identify and respond to diabetic in crisis. ROA.802-05, 807-17, 821, 850, 863-71, 874-78, 880, 904-05, ¶¶ 44, 51, 53, 57, 58, 60, 61, 77, 86-7, 90, 94, 100-01, 107, 113, 118-19, 126-27, 130, 155, 304, 306, 373-76, 378-81, 383-86, 388-89, 391, 393, 395-98, 400-03, 506, 406, 408-11, 413-15, 417-19, 421, 434-74, 476, 595. These policies, practices, and training programs created an overarching custom of denying insulin and blood glucose monitoring in the years before Mr. Shelton's death that caused 14 other deaths. ROA.871-73, 880, 909, 910, ¶¶ 422-426, 473-77, 607-09. Numerous media reports, the 2009 DOJ report, the 2018 and 2021 HMA reports, and the 2020 TCJS citation for deficient, dangerous medical care at the jail underscore the Sheriff's knowledge of the dangerous conditions years before Matthew Shelton ever entered his jail, as do his own 2016 debate comments admitting deficient medical care was leading to detainees dying in the jail. ROA.855, 857-60, 862, 872-74, ¶¶ 326-29, 336-44, 346-48, 350, 352, 355, 363, 425, 427-30; s*ee also* ROA.2739; *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 450-53 (5th Cir. 2009) (reports from DOJ and HMA supported jury finding of unconstitutional conditions

of confinement); *McNeal,* 90 F.4th at 429-30 (denying motion to dismiss individual supervisory liability claim where complaint alleged supervisor received internal reviews and reports that identified constitutional violation); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (medical care a prisoner receives "is just a much a 'condition' of his confinement as the food he is fed."). And Plaintiffs have directly alleged he knew of the conditions and know their consequences: suffering and death. ROA.858, 890-91, 915 ¶¶ 642-44, 526-32, 627.

> 2. *The unconstitutional conditions of confinement in Gonzalez's jail served no penological purpose, violated Mr. Shelton's constitutional rights, and caused Mr. Shelton's death.*

Sheriff Gonzalez did not identify any penological purpose served by any of these conditions in his jail in either the district court or here and has thus waived the argument.[7] ROA.1788-93; *Appellant's Br.,* pp. 10-13; *see Jones v. Cain*, 600 F.3d

---

[7] Though referenced in a sentence about episodic-acts-or-omissions, to the extent the Sheriff is arguing that staying within Harris County's budget is a legitimate government purpose that justifies denying detainees life-sustaining medical care until they die, this argument fails. *See Delaughter v. Woodall*, 909 F.3d 130,139 (5th Cir. 2018) (denying qualified immunity to medical administrator due to fact dispute about whether prison's costs concerns led to denial of medical treatment rather than medical judgment); *Wyatt v. Aderholt*, 503 F.2d 1305, 1314-15 (5th Cir. 1974) (while governmental actor is "ordinarily free to choose among various social services competing for…attention,…that does not mean [it] is free for budgetary or other reasons to provide a social service in a manner that will result in the denial of individuals' constitutional rights"); *see also Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1974) (where "institutions are operating under unconstitutional conditions and practices, the defense[ ] of fund shortage…[has] been rejected by federal courts.").

527, 541 (5th Cir. 2010) (arguments not raised are waived). In any event, there is no legitimate government interest in punishing detainees or denying them medical care until they die. ROA.2739; ROA.906, 913, ¶¶ 596, 620; *Shepherd*, 591 F.3d at 453-54.

The overlap of the dangerous, punishing practices Plaintiffs identify—including understaffing, non-monitoring, and denying Type 1 diabetics insulin and blood glucose monitoring—affected every single interaction Mr. Shelton had (and didn't have) with Sheriff Gonzalez's jailers and jail medical staff, from his first single-dose order for insulin within an hour of arriving at the jail to the jailers' failure to monitor to him for days until he died. ROA.802-46, ¶¶ 42-288. These inherently dangerous practices constituted dangerous conditions of confinement and were the moving force of Mr. Shelton's suffering and death from diabetic ketoacidosis in Sheriff Gonzalez's jail and the violation of his constitutional rights. ROA.799, 800, 823, 843, 846, 880, 890-92, 911, 917, ¶¶ 28, 29, 163, 264, 289, 290, 477, 527-536, 613, 636; *see also Shepherd*, 591 F.3d at 450-51, 458; *Bell,* 441 U.S. at 535.

> 3. *Sheriff Gonzalez was deliberately indifferent in his implementation and maintenance of the unconstitutional conditions.*

Plaintiffs allege that Sheriff Gonzalez actually drew the inference that the risk of a Type 1 diabetic detainee like Mr. Shelton being harmed by the unconstitutional conditions of confinement in his jail was substantial, yet made the intentional choice not to correct those conditions, despite knowing detainee death and injury would

result. Specifically, he knew his policy of understaffing had caused detainees to die or be seriously injured in the past and knew that if he did nothing to change it, detainees would continue to be placed at substantial risk of serious harm. ROA.914-15, ¶¶ 625, 627; *see also* ROA.890, 913, 914, ¶¶ 528, 529, 621, 623. Since the sheriff knew his understaffing would mean jailers could not perform monitoring necessary to protect detainees from harm, this policy was obviously unconstitutional. *Silva v. Donley Cnty., Tex.*, No. 93-1308, 32 F.3d 566, *7 (5th Cir. 1994) (dismissing sheriff's qualified immunity appeal from denial of summary judgment in part because of sheriff's *de facto* policy of non-monitoring because sheriff deployed to few staff in the jail); *see also Shepard v. Hansford Cnty.*, 110 F.Supp.3d 696, 718 (N.D. Tex. 2015) (denying summary judgment to a county where it was "objectively obvious that the consequences of understaffing could include constitutional violations" because jailers were not completing all their duties). The Sheriff's citation to *Scott v. Moore* is thus inapposite as Plaintiffs do not complain and the District Court did not find that the Sheriff's policy of understaffing was *per se* unconstitutional but alleged that, unlike the *Scott* defendant, Sheriff Gonzalez had "actual knowledge that the staffing policy created a substantial risk of harm to [diabetic] detainees." 114 F.3d 51, 54 (5th Cir. 1997). He not only knew that the practices of jailers' non-monitoring detainees had led to detainees suffering and dying in his jail, he also knew that allowing this practice to continue was all but

guaranteed to cause more deaths and injuries. ROA.915, ¶¶ 627, 629; *see* ROA.891, 913, 914, ¶¶ 532, 621, 623. He also drew the inference that continuing to deny diabetic detainees at his jail insulin and blood glucose monitoring would place diabetic detainees at substantial risk of harm and death. ROA.906, 909-10, ¶¶ 597, 606, 608-09.

Further, despite knowing constitutional violations, injuries, and deaths would occur from his dangerous conditions created by his understaffing policy, his jailers' pervasive practice of non-monitoring, and the custom of denying insulin and blood glucose monitoring to detainees, he made the intentional choice not to correct any of these deficiencies. ROA.814, 858, 874-80, 884-85, 888, 890-91, 906, 909-10, 913-15, ¶¶ 113, 344, 435-36, 438-39, 441-44, 446-47, 449-50, 452-53, 455-56, 458-59, 461, 462, 465, 466, 468, 469, 471, 472, 475, 476, 501, 516, 517, 526-28, 529, 532, 597, 606, 608, 609, 621, 623-625, 627, 629.

Finally, contrary to his assertion, Sheriff Gonzalez cannot escape liability in a conditions of confinement case where Plaintiffs allege he was aware of and consciously disregarded a substantial risk of serious harm to a discrete group of vulnerable detainees merely by arguing that he did not know Matthew Shelton belonged to that group of vulnerable detainees. *See Hinojosa*, 807 F.3d at 667; *Contra. Appellant's Br.*, p. 11. Where Sheriff Gonzalez authorized and allowed unconstitutional conditions of confinement to flourish in his jail, his lack of direct

contact with Matthew Shelton is irrelevant. *See McNeal*, 90 F.4th 432 (denying motion to dismiss where official was aware risk posed to prisoners generally).

### 4. Sheriff Gonzalez is not entitled to qualified immunity for implementing unconstitutional conditions of confinement in his jail.

It has been clearly established for decades that officials violate the constitutional rights of pretrial detainees when they subject them to conditions of confinement that constitute punishment, as Sheriff Gonzalez did to Mr. Shelton here. *See Bell,* 441 U.S. at 535. The District Court identified that three cases in particular—*Shepherd, Sanchez II,* and *Montano*—clearly informed Sheriff Gonzalez that he could not inflict dangerous conditions of confinement that denied detainees medical care and monitoring upon Mr. Shelton. ROA.2741-73; *see also Hinojosa,* 807 F.3d at 667-69 (denying motion to dismiss conditions of confinement claims brought against prison officials in individual capacities). As he did with Plaintiffs' complaint, the Sheriff talks past the District Court's order and never cites much less engages with or attempts to distinguish any of the cases the District Court determined set forth the clearly established law. *See Appellant's Br.,* pp. 9-13.

The Court should affirm the District Court's order as all three cases identified by the District Court clearly established that Sheriff Gonzalez's conduct violated Matthew Shelton's constitutional rights. In *Shepherd*, this Court upheld a jury verdict against Dallas County where that county exposed that detainee to dangerous conditions of confinement including understaffing medical positions, routine denial

of medications, understaffing jailers that prevented detainees from being taken to the medical clinic, and regular falsification of medical records in violation of that plaintiff's rights under the Fourteenth Amendment. 591 F.3d at 450-51, 454. Similarly, in *Sanchez II*, this Court reversed a grant of summary judgment where there was a pervasive practice of jailers not monitoring detainees with serious medical needs and falsifying observation rounds as well as several deficient medical policies that, in combination, denied a deceased detainee medical care, constituting unconstitutional conditions of confinement. 956 F.3d at 793-96. Finally, in *Montano*, this Court found that a reasonable juror could find unconstitutional conditions of confinement existed that led to the death of a detainee who jail staff placed in a cell for four ½ days and denied medical care with the expectation he would "heal himself" which would never happen. 843 F.3d at 878-79; *see also* ROA.2742 (*Montano* "reflects that leaving pretrial detainees without observation or medical care in jail qualifies as unconstitutional conditions of confinement.").

Before March 2022, Sheriff Gonzalez was thus on notice that he could not operate a jail that was understaffed, where his jailers had a practice of non-monitoring detainees, and where detainees were regularly denied life-sustaining medical care such that the jail conditions constituted unconstitutional conditions of confinement. Accordingly, he is not entitled to qualified immunity, and the Court should affirm the District Court's denial of his motion.

### D. Sheriff Gonzalez implemented unconstitutional policies, practices, and training programs in his jail for which he is not entitled to qualified immunity.

Mr. Shelton also had a constitutional right, as a pre-trial detainee, to receive adequate medical care for his serious medical needs and protection from harm during his confinement. *Hare II,* 74 F.3d at 636; *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020).

Just as a supervisory official's policy decisions can make him liable for instituting unconstitutional conditions of confinement, so too can those policy decisions result in liability under an episodic-acts-or-omissions theory if there is an (1) official policy or custom, of which (2) he is actually or constructively aware, and that (3) was the moving force of the constitutional violation.[8] *Jauch*, 874 F.3d at 435-36 (denying qualified immunity to sheriff); *see also Colle*, 981 F.2d at 246. The official is liable if he implements the policy with deliberate indifference; that is, he knew of a substantial risk of serious bodily harm or death to a detainee and disregarded that risk by failing to abate it. *Hare II*, 74 F.3d at 650. Similarly, a jail official can be liable for failing to train or supervise his jailers where there is a causal connection between the failure to train or supervise and the violation of the detainee's rights and that failure to train or supervise constituted deliberate

---

[8] Plaintiffs can bring simultaneous conditions of confinement and episodic-acts-or-omissions claims. *See Shepherd*, 591 F.3d at 452 n.1.

indifference to the plaintiff's constitutional rights. *Estate of Davis ex rel. McCully v. City of N. Richland Hills,* 406 F.3d 375, 381 (5th Cir. 2005) (citation omitted).

The District Court correctly found that Plaintiffs stated at least two episodic-acts-or-omissions claims for which the Sheriff was individually liable: his practice of denying insulin and blood glucose monitoring to diabetic detainees and his constitutionally deficient training program. ROA.2744-50. As with Plaintiffs' conditions of confinement claims, both of Plaintiffs' episodic-act-or-omissions claims are predicated on the Sheriff's personal involvement with implementing the policies and lack-of-training programs, thus neither the District Court's order nor Plaintiffs' claims rely upon *respondeat superior.*[9] ROA.2743-45, ROA.2747-49.

> *1.  Sheriff Gonzalez adopted practices in his jail that denied Type 1 diabetics insulin and blood glucose monitoring with deliberate indifference to their known and obvious consequences.*

The Court should deny Sheriff Gonzalez's appeal because Plaintiffs have stated a claim against Gonzalez for his policies or practices that denied diabetic detainees insulin and blood glucose monitoring for four reasons.

First, the plethora of individual policies and practices that all served to deny Type 1 diabetics insulin and blood glucose monitoring—including the single-dose order policy; short-term blood glucose order policy; and practices of not notifying doctors when detainees exhibited symptoms of diabetic ketoacidosis, asked for

---

[9] *See supra* p. 27, fn.5.

insulin, or skipped meals—constituted the Sheriff's official policies as they were the result of his affirmative policymaking choices or were persistent jail practices he knew existed and authorized to continue. *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017) ("Official municipal policy includes…the acts of its policymaking officials, and practices so persistent as to practically have the force of law."); ROA.802-05, 809-13, 815-17, 821, 850, 874-78, 880, 904, ¶¶ 44, 51, 57, 60, 86-7, 90, 94, 100-01, 107, 118-19, 127, 130, 155, 304, 434-35, 437-38, 440-43, 445-46, 448-49, 451-52, 454-55, 457-58, 460-61, 473-74, 595.

Second, Sheriff Gonzalez was subjectively aware of the substantial risk a detainee like Matthew Shelton would be seriously injured or die as a result of the policies or practices that denied insulin and blood glucose monitoring, actually drew the inference that diabetic detainees would be seriously injured or die if they continued, yet implemented, ratified, and continued the policies and practices anyway. Sheriff Gonzalez knew that as a result of his same policies and practices the denied diabetic detainees insulin and blood glucose monitoring 14 diabetic detainees died and another nearly did before Mr. Shelton ever entered his jail. ROA.857-59, 872-73, ¶¶ 336-41, 424, 425, 428; *see also, e.g., Hinojosa*, 807 F.3d at 666-67 (13 deaths supported claim that defendants were aware of substantial risk and consciously disregarded it). The DOJ report, two HMA reports, and 2020 TCJS citation also directly informed him that the policies and practices governing medical

care for detainees with chronic conditions like Type 1 diabetes in the jail violated their constitutional rights and placed them at substantial risk of serious injury and death. ROA.855, 859-60, 862, 873-74, ¶¶ 326-329, 346, 347, 348, 350, 352, 355, 363, 427, 429, 430; *see also, e.g., McNeal,* 90 F.4th at 429-30 (supervisor received notice of constitutional violation from previous lawsuit and reports that identified constitutional violation).

Regardless, even without the pattern of diabetic death and injury, Plaintiffs allege Sheriff Gonzalez admitted during the 2016 debate that he knew detainees were dying in the Harris County Jail as a result of these same policies and practices regarding medical care for detainees specifically including in the jail's initial processing area. ROA.857-58, 873, ¶¶ 336-44, 428-29; *see also, e.g., Bishop v. Arcuri*, 674 F.3d 456, 468 (5th Cir. 2012) (admission of the existence of a policy and uniform officer adherence to policy was evidence of unconstitutional custom without identifying other instances). Likewise, his personal participation in the lengthy transition process of medical care to Harris Health's purview reminded him of each of the policies and practices as well as their dangers, though he was also already aware. ROA.860-61, 863, 874, ¶¶ 354, 358-59, 433. Finally, the uniform conduct of every jail medical staffer and jailer who encountered Mr. Shelton in the Sheriff's jail who followed policy and denied him insulin and blood glucose monitoring also supports the existence of a sufficiently pervasive, dangerous policy

of which Sheriff Gonzalez was aware. *See Bishop*, 674 F.3d at 468 (uniform officer adherence to policy was evidence of unconstitutional custom without identifying other instances); *Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 320 (5th Cir. 2024) (facts in proposed amended complaint alleging existence of dangerous policy were sufficient to show knowledge and deliberate indifference without identifying pattern of other violations, thus court erred in denying leave to amend).

Nonetheless, despite his actual knowledge that the above practices were near certain to kill diabetic detainees, Sheriff Gonzalez did nothing to correct or change these policies but instead allowed them to continue to jeopardize diabetic detainees. ROA.813, 850, 857-58, 864-69, 871-80, 906, 909-10, ¶¶ 113, 306, 340, 343-44, 374, 379, 384, 391, 396, 401, 409, 424-25, 434-76, 597, 607-09. In fact, he continued the dangerous policies and practices for two more years after Mr. Shelton's death, causing the death of another diabetic detainee and at least one additional TCJS citation for deficient medical care. ROA.851-52, 871, ¶¶ 310-315, 422-23. The Sheriff's intentional choice to do nothing to correct the policies and practices he subjectively knew were dangerous constituted deliberate indifference. *See Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001) (pattern can evidence not only the existence of the policy but also the official deliberate indifference); *McNeal,* 90 F.4th at 432 (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)) (supervisor who retains program he knows violates constitutional rights

is deliberately indifferent); *see also Covington v. City of Madisonville, Tex.*, No. 18-20723, 812 Fed. App'x. 219, 227-28 (5th Cir. 2020) (reversing motion to dismiss based on refusal to discipline or address constitutional violations).

Third, the Sheriff's practices that denied insulin and blood glucose monitoring to Type 1 diabetics was the moving force of Matthew Shelton's death. Sheriff Gonzalez's failure to correct any of these practices meant that each of his jails' medical staff and jailers who interacted with Mr. Shelton followed his practices, so no provider ever issued the necessary ongoing order for insulin or blood glucose monitoring. ROA.799-00, 803-07, 810-13, 815-19, 821-23, 843, 846, 880, 890-92, ¶¶ 28-29, 50-52, 55-6, 63, 65, 69, 73, 75-6, 94, 96, 104-107, 121, 127-28, 136, 138, 140-42, 156, 160, 163, 264, 289, 477, 527-36, 613, 636. Had any provider issued an ongoing order for insulin and an order for blood glucose monitoring for Mr. Shelton, he would not have died in agony from diabetic ketoacidosis a mere four days after the last single-dose order. ROA.847, ¶ 290.

Finally, Sheriff Gonzalez is not entitled to qualified immunity. The constitutional right of a pretrial detainee not to have his serious medical needs met with deliberate indifference—that is, to not have officials refuse to treat him, ignore his complaints, intentionally treat him incorrectly, or otherwise engage in conduct evincing a wanton disregard for his needs—had been established for decades before Matthew Shelton ever entered Sheriff Gonzalez's jail. *See Domino v. Tex. Dep't. of*

*Crim. Justice*, 239 F.3d 752, 755 (5th Cir. 2001). Accordingly, Sheriff Gonzalez is not entitled to qualified immunity where he was on notice that he could not implement policies and practices that resulted in jail medical staff refusing to treat Mr. Shelton's medical needs and medical staff and jailers alike ignoring his complaints. *See id*.

Indeed, *Colle v. Brazos County, Texas* put Sheriff Gonzalez directly on notice that he could not implement policies and practices that denied detainees medical care. In *Colle*, this Court denied a motion to dismiss on qualified immunity brought by a sheriff who was alleged to have implemented jail policies that served to deny seriously ill detainees access to medical care and deprived critically ill detainees of necessary monitoring, as Sheriff Gonzalez did here. *Colle,* 981 F.2d at 246; *see also* ROA.2746-47; *Brown v. Cain,* 546 Fed. Appx. 471, 475 (5th Cir. 2013) (reversing summary judgment due to disputes about whether prison medication delivery system was so inadequate that supervisors who enacted policy were deliberately indifferent). The *Colle* court had no trouble finding that the sheriff should have known that such policies would deprive detainees of reasonable medical care. 981 F.2d at 246. This is even clearer here as Sheriff Gonzalez actually knew the policies endangered detainees. ROA.890-91, 906, 909-10, 913-15, ¶¶ 528, 529, 532, 597, 606, 608-09, 621, 623, 625, 627. Once again, the Sheriff utterly failed to engage with the District Court's order, nowhere citing much less addressing or attempting to

distinguish *Colle. See Appellant's Br.,* at pp. 9-13.

Because Plaintiffs have established that Sheriff Gonzalez implemented practices in his jail that denied Type 1 diabetics insulin and blood glucose monitoring, knew the practices would cause diabetic detainees in his jail to suffer and die, and yet intentionally allowed the practices to continue anyway and that Matthew Shelton's right to not be denied care for his serious medical needs was established by *Colle*, the Court should affirm the District Court's order.

> 2. *Sheriff Gonzalez failed to train his jailers on Type 1 diabetes and monitoring detainees despite knowing to a moral certainty such training was necessary to prevent detainee death.*

Because Plaintiffs also state a claim for the Sheriff's failure to train his jailers, the Court should affirm the District Court's order for four additional reasons.

First, a policymaker's decision to provide no training as Sheriff Gonzalez did here is a policy decision. *City of Canton, Ohio, v. Harris*, 489 U.S. 378, 390 (1989); *Board of County Comm'rs of Bryan Cnty., Okl, v. Brown*, 520 U.S. 407, 407-08 (5th Cir. 1997). ROA.814, 874-80, 904, 905, ¶¶113, 436, 439, 444, 447, 450, 453, 456, 459, 462, 463-72, 476, 595.

Second, Sheriff Gonzalez was subjectively aware of the need for the training program yet chose not to implement it. He knew to a moral certainty that his jail would detain Type 1 diabetics, and that his training programs—which provided no training on ongoing orders for insulin and blood glucose monitoring; no training to

his jailers to recognize the signs or symptoms of high blood glucose, low blood glucose, or diabetic ketoacidosis or even the gravity of a Type 1 diabetes diagnosis and diabetics' need for insulin multiple times per day, every day and also no training on the need to observe detainees face-to-face at intervals no greater than sixty minutes for signs of medical distress—placed detainees with diabetes at substantial risk of injury and death. ROA.804-05, 807-08, 810, 814, 816, 850, 863-71, 874-80, 904-05, ¶¶ 53, 58, 61, 77, 94, 113, 126, 306, 373-76, 378-81, 383-86, 388-89, 391, 393, 395-98, 400-03, 405-06, 408-411, 413-15, 417-19, 421, 436, 439, 444, 447, 450, 453, 456, 459, 462-72, 476, 595; *see also Estelle v. Gamble,* 429 U.S. 97, 103 (5th Cir. 1976) (jail officials know they will detain people with serious and chronic medical conditions).

The same pattern of 13 diabetic deaths, serious injuries, reports, and TCJS citations that put Sheriff Gonzalez on notice that his jail had dangerous practices that denied insulin and blood glucose monitoring to detainees also put him on notice that his training program was dangerous and would continue to place detainees at substantial risk of harm. ROA.855, 857-60, 862, 872-74, ¶¶ 326-29, 336-41, 346-48, 350, 352, 355, 363, 424-25, 427-28, 430; *see also Garcia v. City of Lubbock,* No. 21-11134, 2023 WL 4636896, *5 (5th Cir. 2023) (ten prior detainee deaths were sufficient to put jail supervisor on notice of need to train on diabetic emergencies).

He was likewise aware that his jailers had a pervasive practice of non-

monitoring detainees, yet he provided no training on individually observing all detainees at least every sixty minutes for signs of medical distress, despite knowing that this flaw in his training program continued to place detainees at substantial risk of serious injuries. ROA.912-16, ¶¶ 619 (f)-(g) & (i), 621-623, 626, 629-30, 632. His jail's seven TCJS citations for jailers failures to observe detainees, his jailers' admissions in the *Doe* complaint, persistent media attention on his jail's continual failures to monitor medically vulnerable detainees in his care and fraudulent monitoring, at least eleven additional deaths or serious injuries from failures to monitor, and his jailers' persistent fraud concerning observation rounds put him on notice that he had not trained his jailers to understand the gravity of Type 1 diabetes, recognize the signs of a diabetic emergency or other medical crisis, or the need to individually observe detainees for signs of medical distress at least every sixty minutes. ROA.881-88, ¶¶ 479-83, 485-87, 489-93, 495, 498-99, 502, 504-18.

Indeed, even without the pattern of 21 deaths and numerous TCJS citations, the Court can infer the Sheriff's deliberate indifference where the risk of serious injury and death of Type 1 diabetics and other vulnerable detainees was the "obvious" and "predictable consequence" of his failure to train his jailers on Type 1 diabetes and conducting hourly face-to-face observations to check for medical distress. *See Littell v. Houston Ind. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018); s*ee also Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575, 584 (3rd Cir. 2003) (in

case of diabetic prisoner denied insulin, prison operator's failure "to establish a policy to address immediate medication needs of inmates with serious medical conditions created a risk that is sufficiently obvious as to constitute deliberate indifference to inmates' medical needs"); *Glisson v. Indiana Dep't of Corr.,* 849 F.3d 372, 380 (7th Cir. 2017) (jury could find that it was "just as certain" as the "moral certainty" described in *City of Canton, Ohio v. Harris* that jail providers would be confronted with detainees with chronic illnesses and the need to establish protocols for the coordinated care of those illnesses is obvious).

Though he knew the training was necessary, Sheriff Gonzalez intentionally chose to do nothing to correct the training deficiencies that he knew were certain only to lead to more injury and death of medically vulnerably detainees like Type 1 diabetics. ROA.850, 864-65, 867-68, 874-80, 910, 917, ¶¶ 306, 374-75, 380, 385, 397, 402, 436, 439, 444, 447, 450, 453, 456, 459, 462, 466, 469, 472, 476, 609, 632. Because Sheriff Gonzalez was "on actual or constructive notice that a particular omission in [his] training program cause[d]…employees to violate citizens' constitutional rights, [he] may be deemed deliberately indifferent [because he] chose to retain the program." *Connick,* 563 U.S. at 61 (citing *Board of Cnty. Com'rs of Bryan Cnty., Ok. v. Brown*, 520 U.S. 397, 407 (1997)).

Third, the Sheriff's decision not to implement any training program on Type 1 diabetes or monitoring was the moving force of Mr. Shelton's death. If any of the

18 jailers had actually observed Mr. Shelton and his obvious medical distress between March 24 and March 27, 2022 and gotten medical help, he would not have died. ROA.827, 829, 831-32, 834-43, 892, 911, 917, ¶¶ 185-86, 195-96, 204, 208-09, 222-38, 242-49, 252-63, 535-36, 613, 636.

Finally, Sheriff Gonzalez is not entitled to qualified immunity. As the District Court found, Sheriff Gonzalez was on notice he could not refuse to provide even "minimal training" to detect "obvious medical needs" of detainees with known, demonstrable, or serious disorders.[10] ROA.2749-50; *Burns v. City of Galveston, Tex.*, 905 F.2d 100, 104-05 (5th Cir. 1990); *see also, e.g., Partridge v. Two Unknown Police Officers of City of Houston, Tex.*, 791 F.2d 1182, 1188 (5th Cir. 1986) (inadequate training concerning mental illness may be basis of deliberately indifferent custom). Once again Sheriff Gonzalez did not even cite or discuss *Burns* though the District Court cited it as identifying the clearly established law. ROA.2749; *Appellant's Br.*, pp. 9-13.

---

[10] *See also, e.g., Silva v. Donley Cnty., Tex.*, No. 93-1308, 32 F.3d 566, *6-*7 (5th Cir. 1994) (dismissing summary judgment appeal of sheriff who provided no training on recognizing suicide) (under 5th Circuit Rule 47.5.3, as an unpublished opinion issued before January 1, 1996, *Silva* is precedential); *Bond v. Nueces Cnty., Tex.*, No. 20-40050, 2022 WL 4595000, *9 (5th Cir. 2022) (district court erred by denying motion for leave to amend where proposed amended complaint stated a claim for jail's failure to provide training to identify and assess detainees with medical concerns); *see also Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) (unpublished cases can guide the Court to identify the clearly established law at the time of the underlying incident).

Because Plaintiffs have stated an independent failure to train claim against Sheriff Gonzalez for providing no training to his jailers on Type 1 diabetes or monitoring diabetic detainees for which Sheriff Gonzalez is not entitled to qualified immunity, the Court should affirm the order of the District Court and deny the Sheriff's appeal.

## VI.    CONCLUSION

For the foregoing reasons, the Court should dismiss the Sheriff's appeal or, in the alternative, should affirm the District Court's ruling and deny Sheriff Gonzalez's motion to dismiss.

Dated: February 13, 2026.

Respectfully submitted,

/s/ Jeff Edwards
John Flood, attorney-in-charge
State Bar No. 07155910
So. Dist. Bar No. 12593
OF COUNSEL:
Jeff Edwards
State Bar No. 24014406
jeff@floodtriallawyers.com
Lisa Snead
State Bar No. 24062204
lisa@floodtriallawyers.com
JOHN T. FLOOD, L.L.P.
819 Upper Broadway
Corpus Christi, Texas 78401
Tel. 361-654-8877
Fax. 371-654-8879
john@floodtriallawyers.com
irma@floodtriallawyers.com

ATTORNEYS FOR PLAINTIFFS-APPELLEES

## CERTIFICATE OF SERVICE

I certify that on February 13, 2026, the foregoing document was

served, via the Court's CM/ECF Document Filing System, upon all counsel of

record.

  /s/ Jeff Edwards
JEFF EDWARDS
**Attorney for Plaintiffs-Appellees**

**CERTIFICATE OF COMPLIANCE**

I hereby certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the filed document in compliance with Fifth Circuit Rule 25.2.1; (3) the document has been scanned with the most recent version of Avast antivirus software and is free of viruses; and (4) the document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, v. 16.70, in Times New Roman, 14-point font and contains 12,185 words excluding the items identified in FED. R. APP. P. 32(f).

/s/ Lisa Snead
LISA SNEAD
**Attorney for Plaintiffs-Appellees**